Filed 6/26/23  In re Jorge G. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re JORGE G., a Person Coming Under the Juvenile Court Law. | B323059 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP00627C) |
| Plaintiff and Respondent, | |
| v. | |
| ABRAHAM G. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of Los Angeles County, Tiana J. Murillo, Judge.  Conditionally affirmed and remanded with directions.

Law Office of Karen B. Stalter and Karen B. Stalter, under appointment by the Court of Appeal, for Defendant and Appellant, Abraham G.

Serobian Law and Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant, J.D.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

—————————————

J.D. (mother) and Abraham G. (father) appeal from the order of the juvenile court terminating their parental rights to their son, Jorge G.  Mother contends the juvenile court misapplied the parental-benefit exception to termination of parental rights.  (See Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i).)  Joined by father, mother also contends that both the Los Angeles County Department of Children and Family Services (DCFS) and the juvenile court conducted an inadequate inquiry pursuant to California law implementing the Indian Child Welfare Act (ICWA).  (See § 224.2.)

We conclude that the juvenile court did not err in determining that the parental-benefit exception did not apply here.  However, because DCFS concedes that a limited remand is appropriate for purposes of conducting a sufficient inquiry under ICWA and related California provisions, we conditionally affirm the juvenile court's order terminating parental rights and

---

[1]    All undesignated statutory references are to the Welfare and Institutions Code.

2

remand this matter to the juvenile court for the sole purpose of ensuring compliance with ICWA and related California statutes.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Dependency petition, jurisdiction, and disposition

Mother and father have three children: Elisa, born in February 2008; Jasmine, born in August 2009; and Jorge, born in January 2018.  Only Jorge is the subject of these appeals.

In January 2018, DCFS received a referral stating that mother tested positive for methamphetamine the day after Jorge was born and tested positive for marijuana a month earlier.  In interviews with DCFS after the referral, mother acknowledged using marijuana regularly during her pregnancy.  Father also acknowledged recently using methamphetamine, crack, and marijuana.

On January 30, 2018, DCFS filed a dependency petition on behalf of the children pursuant to section 300 alleging that mother and father had histories of substance abuse and were current abusers of methamphetamine and marijuana.  The juvenile court thereafter ordered the children detained.  Elisa was placed with a paternal aunt, Maria H., and Jasmine and Jorge were placed with another paternal aunt, Rosio S.

In subsequent interviews with DCFS, the parents described an incident in which Jasmine was inadvertently struck as father attempted to stop a physical altercation between mother and her sister.   Hence, on March 27, 2018, DCFS filed a first amended dependency petition to include an additional count relating to the altercation.

In April 2018, the juvenile court conducted a combined jurisdiction/disposition hearing.  The court sustained the

3

allegations in the amended petition, ordered the children removed from the parents' custody, ordered DCFS to provide the parents with reunification services, and ordered monitored visitation for the parents.

## II. Interim reports and status hearings

### A. September 2018 report

DCFS filed a status report in September 2018. Both parents were enrolled in substance abuse treatment programs but continued to struggle with sobriety. Nonetheless, DCFS reported that the parents were coordinating with the caregivers to maintain visits with the children and no concerns with the visits were reported.

The children had adjusted well to their current placements. While both Elisa and Jasmine reported missing their parents, Jorge was too young to make a statement.

### B. November 2018 report and hearing

DCFS filed another status report in November 2018. Both parents continued with their treatment programs and were generally maintaining their sobriety.

The parents continued to visit the children on a weekly basis but had been arriving late to visits. Mother also sometimes ended visits with Jasmine and Jorge after 30 minutes because she was not comfortable with their caregiver, Rosio S. The parents shared transportation, so father left the visits early with mother. Still, both parents reported enjoying spending time with the children.

At a status hearing on November 27, 2018, the juvenile court found that the parents' progress with their case plans had been substantial and ordered continued reunification services.

4

The court also maintained the children's placement orders, but allowed the parents to have unmonitored visits with the children and gave DCFS discretion to further liberalize their visits.

### C.    May 2019 report and hearing

DCFS filed another status report in May 2019. Both parents continued to be compliant with their case plans and maintain their sobriety.

By then, the parents were having unmonitored visits with the children, which were going well. DCFS was considering overnight visits, but father was currently homeless and mother was not permitted to have children stay at her sober living facility. Hence, DCFS approved overnight visits at the home of Bertha B., mother's aunt.

According to a last minute information report filed by DCFS on May 21, 2019, the children had an overnight visit with the parents at Bertha B.'s house in early May, which went well, and two more overnight visits had been scheduled.

At a status hearing on May 21, 2019, the juvenile court ordered continued reunification services and maintained the children's placement orders.

### D.    August and November 2019 reports

DCFS filed an interim status report in August 2019. The parents continued to be unable to secure stable housing. With minor exceptions, they had been testing negative for drugs and alcohol.

The parents continued to have overnight visits with the children at Bertha B.'s home, and DCFS reported having no concerns with the visits. DCFS's August 2019 status report thus

recommended that the children be released to the parents within five court days of the parents securing appropriate housing.

DCFS filed another status report in November 2019. Both parents were employed and continued to test negative for drugs and alcohol, but remained homeless.

The parents continued to have overnight visits with the children, but DCFS reported that the visits had "not been consistent." According to the report, the parents had trouble with transportation to and from visits and they "lack[ed] in communication with [the] caregivers if visits will be occurring with the children over the weekend." DCFS further reported that although visits went well, "the lack of consistency has discouraged the children from being excited to have a visit with their parents over the weekend, due to being disappoint[ed], when visits do not occur."

### E.     June 2020 report and September 2020 hearing

DCFS filed another status report in June 2020.

Between January and May 2020, both parents missed some of their scheduled drug tests and father tested positive a few times. Both parents remained homeless, and were not participating in counseling in accordance with their case plans.

Although the parents were able to spend Christmas 2019 with their children at Bertha B.'s home, Bertha B. had since moved and could no longer accommodate the parents' overnight visits. The parents thus had a couple of overnight visits with the children at motels when they could afford it. The parents also visited the children once in June 2020 at the home of Rosio S. That visit went well and the children enjoyed spending time with their parents. Recent visits had otherwise been virtual because

6

of the COVID-19 pandemic. Those visits went well and were consistent.

At a hearing in September 2020,[2] the juvenile court ordered continued reunification services and maintained the children's placement orders.

### F.    February 2021 report and March 2021 hearing

DCFS filed another status report in February 2021.

The parents missed 15 drug tests and tested negative several times between late October 2020 and February 2021. DCFS was thus unable to confirm that the parents had maintained sobriety. Mother was temporarily residing with Bertha B. and father remained homeless.

Overnight visits with the children had resumed at Bertha B.'s house. While visits went well when they occurred, DCFS again reported that visits had been inconsistent and that the parents had not been regularly communicating with the caregivers about whether visits would occur. DCFS also emphasized again that the lack of consistency had discouraged the children, who were disappointed when visits did not occur.

At a hearing in March 2021, the juvenile court found the parents were in partial compliance with their case plans, ordered continued reunification services, and maintained the children's placement orders.

---

[2]    Due to the then-pending COVID-19 pandemic, the juvenile court continued hearings scheduled for April and June 2020 until September 2020.

### G.  May 2021 report and hearing

DCFS filed another status report in May 2021.

DCFS could not confirm the parents' sobriety because they did not show up to the majority of their scheduled drug tests between March and April 2021.  The parents were living in a mobile home but did not have a reliable location to connect to amenities like water and power.

DCFS continued to report that the parents' visits, although they went well when they occurred, had been inconsistent and that the children were discouraged as a result.  Because neither parent had an operable vehicle and they declined to use public transportation, they were relying on the paternal aunts to help transport the children to and from overnight visits.

According to a last minute information report filed by DCFS on May 18, 2021, mother tested positive for methamphetamine and amphetamine in April 2021 and did not show up for a scheduled drug test the next week.

At a hearing on May 25, 2021, the juvenile court found that the parents were not in substantial compliance with their case plans, terminated reunification services, maintained the children's placement orders, and ordered monitored visitation.[3] The court also set a hearing pursuant to section 366.26 for November 2021.

---

[3]  Two months later, DCFS reported that father's visits with the children had become "nonexistent," that he was not in contact with DCFS, and that his compliance with his case plan was "minimal."

## H. Section 366.26 reports

DCFS filed a report pursuant to section 366.26 in September 2021. In July 2021, Jasmine and Jorge had been placed with Bertha B. due to a child abuse referral in their previous home. Elisa remained with paternal aunt Maria H.

Bertha B. was willing to monitor visits with the parents, but the parents had failed to schedule visits. According to the report, mother had "maintained telephone contact," but it is unclear from the report with whom or how often she maintained contact.

The report recommended guardianship for Jasmine and adoption for Elisa and Jorge. DCFS intended to reassess the children's permanent placement plan once Bertha B.'s home was approved. DCFS thus requested to continue the pending section 366.26 hearing. The juvenile court continued the matter until January 2022.

DCFS filed a second report pursuant to section 366.26 in December 2021. By then, DCFS had determined that Bertha B.'s home was not suitable for permanent placement of all three children. It therefore asked to continue the hearing for 90 days to assess Elisa's permanent placement.

DCFS further reported that in mid-October 2021, mother had agreed to weekly four-hour monitored visits with the children at a park. A monitored visit by mother that same month went well. She stayed for the duration of the visit and was attentive to the children.

## I. January 2022 hearing and May 2022 report

A permanency planning hearing was scheduled for January 2022. Before the hearing, DCFS filed an updated adoptive

9

planning report for Jorge, now four years old.  DCFS recommended adoption of Jorge by Bertha B., who had been approved for adoption and had been caring for Jorge since July 2021.  At the hearing, the court continued the section 366.26 hearing to May 2022.

DCFS filed another status report in May 2022.  Mother had been consistently visiting the children weekly at a park near Bertha B.'s home, with Bertha B. monitoring the visits.  The visits went well and mother was attentive to the children.

According to DCFS's report, Elisa and Jasmine understood they could not reunify with their parents.  Jasmine was happy residing with Bertha B., and Elisa wanted to reside with Bertha B. too.  Jorge was too young to make a meaningful statement.

## III.    Section 366.26 hearing

The juvenile court held a hearing pursuant to section 366.26 on August 22, 2022.[4]

Counsel for DCFS requested that the court terminate parental rights for Jorge and order legal guardianship for Jasmine.  Counsel emphasized that mother had visited the children only "somewhat consistently," and that father had not visited them at all since July 2021.  Counsel further explained that DCFS's recommendations for Jasmine and Jorge were different because they were not similarly situated.  Whereas Jasmine had spent a significant amount of time under her parents' care before she was removed from their custody at eight years old, Jorge was removed from his parents' custody at birth and thus had never been under their care.  Citing *In re Caden C.*

---

[4]    Regarding Elisa, the court continued the matter 60 days.

10

(2021) 11 Cal.5th 614 (*Caden C.*), counsel for DCFS further contended that there was no compelling reason that terminating parental rights would be detrimental to Jorge.

Father's counsel stated that father objected to termination of his parental rights to Jorge. According to counsel, father had weekly phone and video calls with Jorge and Jorge was "always happy to see him." Counsel thus asked the court to apply the parental-benefit exception to adoption, arguing that the benefits to Jorge from adoption would be outweighed by the detriment from losing his relationship with father.

Mother's counsel stated that mother also objected to termination of her parental rights to Jorge. Counsel argued that as Jorge grew older he would resent that his sisters were in legal guardianships and could continue their relationships with the parents, but he could not. Counsel also asked the court to apply the parental-benefit exception.

Counsel for the children argued in favor of DCFS's recommendations. Counsel noted that there was no evidence of father's ongoing phone calls with Jorge, and that father had not visited the children since July 2021. Counsel likewise noted that mother's visits had been inconsistent throughout the dependency proceedings and that, unlike his siblings, Jorge had been removed from his parents' custody since birth. Moreover, counsel emphasized the absence of evidence of a substantial, positive, emotional attachment between Jorge and either parent.

At the conclusion of argument, the juvenile court found by clear and convincing evidence that Jorge was likely to be adopted. It further found no evidence to support the conclusion that it would be detrimental to Jorge to sever the relationship with his parents. While it noted "some evidence of visitation with mother,

that visitation does not rise to the level of the positive and substantial and emotional attachment that is outlined by the *In re: Caden C.* matter." Nor was the court persuaded by the argument of mother's counsel that Jorge might later resent his sisters' continued relationship with the parents. The court thus concluded that the parental-benefit exception did not apply, terminated the parents' parental rights to Jorge, and designated Bertha B. as Jorge's prospective adoptive parent.

Both parents timely appealed.

## IV. Additional ICWA-related background

We briefly summarize additional background relevant to the ICWA arguments raised by the parents.

DCFS attached ICWA-010(A) Indian Child Inquiry Attachment forms to its section 300 petition filed in January 2018, indicating that it interviewed the parents about their Native American heritage. According to those forms, mother denied having any Native American heritage, but father "reported that he may have Native American heritage." The forms thus noted that the children "may have Indian ancestry."

Father appeared in juvenile court on January 31, 2018. He stated that he was not aware of having any Native American heritage, but was unsure about whether mother had any such heritage. The court then found no reason to know that ICWA applied to the case. That same day, father filed an ICWA-020 Parental Notification of Indian Status form stating, "I have no Indian ancestry as far as I know."[5]

---

[5] On April 28, 2023, we granted DCFS's motion to augment the record to include father's ICWA-020 form.

12

Mother appeared in juvenile court on February 5, 2018. She denied having any Native American heritage. The court again found no reason to know that ICWA applied to the case. That same day, mother filed an ICWA-020 Parental Notification of Indian Status form stating, "I have no Indian ancestry as far as I know."

In connection with its March 2018 jurisdiction/disposition report, DCFS interviewed the parents about their family histories. Mother was raised by her paternal aunt beginning at age two following the death of her parents. Mother had five sisters and a brother. Father was the youngest of 13 siblings. His mother was deceased, but he maintained a relationship with his father.

On appeal, DCFS concedes that the "record does not document DCFS inquired of the relatives it had contact with during the underlying proceedings as to whether Jorge is or may be an Indian child." Those relatives include maternal great aunt Bertha B.; paternal aunts Rosio S. and Maria H.; and paternal uncle Jorge.[6]

---

[6] DCFS also had contact information for paternal grandfather Librado G., who spent time in both the United States and Mexico. Additionally, the record reflects that DCFS held two family meetings in March 2018, and that someone named Misty A., who identified herself in sign-in sheets as "prima," "tia," "prima-in-law," and "cousin-in-law," attended the meetings. DCFS concedes the record does not document that DCFS inquired of Librado G. or Misty A. whether Jorge is or may be an Indian child.

13

## DISCUSSION

Mother argues that the juvenile court focused on improper factors in concluding that the parental-benefit exception to termination of parental rights under section 366.26, subdivision (c)(1)(B)(i) did not apply here. She also contends that the juvenile court minimized the evidence of her visitation with Jorge, and that her bond with him was substantial. Joined by father, mother further contends DCFS and the juvenile court conducted an inadequate inquiry pursuant to ICWA and related California law. We address each contention in turn.

## I. Parental-Benefit Exception

### A. Applicable law

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the juvenile court has ended reunification services, adoption is the legislative preference. (§ 366.26, subd. (b)(1).) When the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates terminating parental rights and placing the child for adoption unless the parent can show an exception applies. (§ 366.26, subd. (c)(1); *Caden C.*, *supra*, 11 Cal.5th at p. 625.)

One such exception is the parental-benefit exception, which applies if the harm from severing the parent-child relationship outweighs the benefit of placing the child in an adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) To establish this exception, the parent must demonstrate, by a preponderance of the evidence, that termination would be detrimental to the child in light of three statutory elements: (1) regular visitation and contact with the child, (2) a relationship, the continuance of

which would benefit the child, such that (3) terminating parental rights would be detrimental to the child.  (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, at p. 631.)  In assessing whether termination would be detrimental, "the [juvenile] court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."  (*Caden C.*, at p. 632.)

The first element, regular visitation and contact, "is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' "  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

The second element requires the court to "assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)  Again here, the focus is the child.  And the relationship may be shaped by a slew of factors, such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  In evaluating this factor, "courts often consider how children feel about, interact with, look to, or talk about their parents."  (*Ibid.*)

The third element—whether termination would be detrimental to the child due to the relationship—requires the court to decide whether it would be harmful to the child to sever the relationship and choose adoption.  (§ 366.26, subd. (c)(1)(B); see also *id.*, subd. (c)(1)(D).)  In making this determination, a court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  In each case, then,

15

"the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Id*. at p. 633.)

In considering these issues, the parent's struggles with issues such as those that led to dependency are relevant only "to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Caden C.*, *supra*, 11 Cal.5th at p. 638.) As our Supreme Court has explained: "[H]ow and how much the loss of a relationship with a parent may be harmful, how and how much that harm might be offset by a new family are complex questions not always answered just by determining how beneficial the child's relationship with the parent is. Though there is no reason for a court to consider 'a second time' the same struggles in the same way, a parent's struggles with substance abuse, mental health issues, or other problems could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental." (*Id*. at p. 639.)

Because the first two elements—whether the parent has visited the child consistently, and whether the relationship is

16

such that the child would benefit from continuing it—are factual determinations, we review them for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) The third element—whether termination of parental rights would be detrimental to the child—requires the court to engage in a "delicate balancing" and assess "the likely course of a future situation that's inherently uncertain." (*Id*. at p. 640.) This determination is inherently discretionary, and thus we review it for abuse of discretion. (*Ibid*.)

### B.    Analysis

Mother argues that the juvenile court focused on improper factors in determining that the parental-benefit exception did not apply here. According to mother, the court erred by focusing on mother's failure to reunify with Jorge, and "minimized the strong bond that mother and [Jorge] shared by way of two years of overnight unmonitored visitation from May 2019 to May 2021, and then regular weekly monitored visitation until August 2022 when the court terminated mother's parental rights." Mother further contends her bond with Jorge was "unequivocally positive, substantial, and worth preserving by way of legal guardianship."

We disagree with mother's contentions. It is correct that *Caden C.* held that "[p]arents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the [parental-benefit] exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) But based on our review of the record, nothing indicates the juvenile court relied on mother's failure to comply with her case plan or reunify with Jorge in concluding the parental-benefit exception was inapplicable here.

17

On the contrary, at the section 366.26 hearing the juvenile court focused on the three-part test outlined in *Caden C.* It noted the absence of evidence "that it would be detrimental to [Jorge] to sever the bond with his parents. While there is some evidence of visitation with mother, that visitation does not rise to the level of the positive and substantial and emotional attachment that is outlined by the *In re Caden C.* matter." The court's minute order from that same hearing likewise cited the court's findings that "the parent[s] ha[ve] not maintained regular visitation with [Jorge] and ha[ve] not established a bond with the child. The Court finds that any benefit accruing to [Jorge] from his . . . relationship with the parent(s) is outweighed by the physical and emotional benefit [Jorge] will receive through the permanency and stability of adoption . . . ." It is therefore clear that the juvenile court applied the correct criteria in determining that the parental-benefit exception did not apply.[7] (See *Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.)

We are also unpersuaded by mother's argument that the trial court minimized the evidence of her visits and contact with Jorge. As DCFS argues, mother's argument overlooks the evidence that her visitation with Jorge was inconsistent over the course of the dependency proceedings. True, DCFS's reports from September 2018, May and August 2019, June 2020, December

---

[7] Mother argues that DCFS "focused on the fact that mother did not obtain suitable housing and later relapsed to drug use, and the court adopted this reasoning." Mother provides no record citations to support the claim that the court adopted this reasoning. Rather, for the reasons discussed herein, we find that the juvenile court correctly applied the criteria listed in section 366.26, subdivision (c)(1)(B)(i).

18

2021, and May 2022 reported that mother was consistently visiting Jorge to the extent permitted by the visitation orders. Equally true, however, DCFS's report from November 2018 stated that mother had been arriving late to and leaving early from visits, and its reports from November 2019, and February, May, and September 2021 all reported that mother's visits with Jorge were inconsistent. Given the "straightforward" nature of the first element of the test for the parental-benefit exception— "whether 'parents visit consistently,' taking into account 'the extent permitted by court orders' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632; see § 366.26, subd. (c)(1)(B)(i))—we find no error with the juvenile court's determination, supported by substantial evidence, that mother failed to maintain regular visitation and contact with Jorge. (See *In re A.G.* (2020) 58 Cal.App.5th 973, 995 [" ' "Sporadic visitation is insufficient" ' " to establish first element]; *In re C.F.* (2011) 193 Cal.App.4th 549, 554 ["Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption."].)

Mother's final argument is that the bond between her and Jorge was "unequivocally positive, substantial, and worth preserving" such that legal guardianship, not adoption, was the best permanent plan for Jorge. Although mother does not say so explicitly, we assume this argument addresses the second element of the parental-benefit exception. (See *Caden C.*, *supra*, 11 Cal.5th at p. 636 [second element of parental-benefit exception test requires parent to "show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"].) But because mother cannot satisfy the first element, i.e., regular visitation, she cannot establish the

19

parental-benefit exception regardless of the second element. (See *ibid.* [parent must establish all three elements of parental-benefit exception]; *In re I.R.* (2014) 226 Cal.App.4th 201, 212 [failure to visit "consistently and to the extent permitted by court orders" would "fatally undermine any attempt to find the beneficial parental relationship exception"].) Nor does mother appear to directly address the third element of the parental-benefit exception.

And even if we reached mother's argument, we are not convinced by it. As noted, under the second element, "courts assess whether 'the child would benefit from continuing the relationship,' " and evaluate factors such as " 'the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C., supra*, 11 Cal.5th at p. 632; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575–576.)

Mother's argument relies on the evidence of her visitation with Jorge, which she argues proves a "substantial positive bond" between them. But mother fails to point to anything specific in the record showing that the visits reflected her "substantial, positive, [and] emotional attachment" with Jorge. (*Caden C., supra*, 11 Cal.5th at p. 636.) We acknowledge that DCFS reported visits typically went "well" when they occurred, but that evidence falls short of establishing the second element of the parental-benefit exception.

We find our decision in *In re Angel B.* (2002) 97 Cal.App.4th 454 (*Angel B.*), instructive here. There, the mother used cocaine and amphetamines during her pregnancy, her child was detained immediately after birth and placed in foster care, and the child

20

never lived with her mother. (*Id*. at p. 459.) At first, mother appeared "for only some of the scheduled visits" with her child. (*Ibid*.) Mother later maintained her sobriety and had "regular visits with [the child], which went well." (*Ibid*.) Mother's parental rights were later terminated. (*Ibid*.)

On appeal, the court, applying the same factors later identified in *Caden C*. as relevant to the second element, concluded that the juvenile court did not err in rejecting application of the parental-benefit exception. (See *Angel B.*, *supra*, 97 Cal.App.4th at pp. 467–468.) In particular, the court noted that the child was "too young to understand the concept of a biological parent"; had "spent relatively few hours visiting with Mother, versus many hours being parented by the foster family"; the child's interactions with mother were positive, "but nothing in the record indicates that, from [the child's] point of view, the interactions were particularly like those of a child with her mother"; and there was "no evidence that [the child] has any particular needs that can be met by Mother but not by the foster family." (*Id*. at pp. 467–468.)

These same considerations apply here. We have no doubt that mother cares deeply for Jorge. But sadly, Jorge was detained at birth and never resided with mother. His primary caregivers from birth were Rosio S. and later Bertha B., with whom he spent most of his time. And even assuming mother's interactions with Jorge were positive during her inconsistent visits with him, she points to nothing in the record that compels the conclusion that their bond was such that Jorge would " 'benefit from continuing the relationship.' " (*Caden C.*, 11 Cal.5th at p. 632, quoting § 366.26, subd. (c)(1)(B)(i); see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other

21

grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 [where the trier of fact has concluded that the party with the burden of proof did not carry the burden and that party appeals, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"].)

In sum, the juvenile court did not err in concluding that the parental-benefit exception was inapplicable here. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 639–640; § 366.26, subd. (c)(1)(B)(i).)

## II.   ICWA

### A.   Applicable law

"Congress passed ICWA in 1978 ' "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . ." [Citation.]' (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8 (*Isaiah W.*); see 25 U.S.C. § 1902.)" (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 998.)

California adopted conforming legislation, which "provides that the court and county welfare department have an affirmative and continuing duty to inquire whether a child for whom a petition may be filed is or may be an 'Indian child' (§ 224.2, subd. (a))—that is, an 'unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe' (25 U.S.C. § 1903(4); § 224.1, subd. (a) [adopting federal definition]).

"The state law duty to make an ICWA inquiry 'begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child.' (§ 224.2, subd. (a).) If a child is removed from parental custody, the county welfare department 'has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' (§ 224.2, subd. (b).) Further, at the first appearance in court of each party, 'the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child' and 'shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.' (§ 224.2, subd. (c).)

"If the initial inquiry provides 'reason to believe' that an Indian child is involved in a proceeding—that is, if the court or social worker 'has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe'—then the court or social worker 'shall make further inquiry' regarding the child's possible Indian status as soon as practicable. (§ 224.2, subd. (e).) Further inquiry 'includes, but is not limited to, all of the following: (A) Interviewing the parents, Indian custodian, and extended family members . . . . [¶] (B) Contacting the Bureau of Indian Affairs and the State Department of Social Services . . . . [and] [¶] (C) Contacting the tribe or tribes and any other person that may

23

reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.' (*Ibid*.)" (*In re Ezequiel G.*, *supra*, 81 Cal.App.5th at pp. 998–999.)

Appellate courts have adopted different standards to evaluate if a deficient inquiry pursuant to ICWA was harmless or warrants reversal. (See *In re Dezi C.* (2022) 79 Cal.App.5th 769, 777–779 [describing different standards]; see also *In re Ezequiel G.*, *supra*, 81 Cal.App.5th at pp. 999–1002.) Moreover, as DCFS notes, our high court has granted review of several appellate decisions concerning the appropriate standard to evaluate prejudicial error in this context.[8] We need not address this issue here because, as discussed below, the parties agree a limited remand is appropriate.

### B. Analysis

Mother and father contend that DCFS failed to comply with its duty under ICWA and related California provisions to inquire of their extended relatives about Jorge's possible Indian ancestry. They also contend that the juvenile court failed to comply with its duty to ensure DCFS's compliance with the agency's inquiry obligations. Mother and father further argue that these failures constitute reversible error, and ask that we reverse and remand

---

[8] See *In re Dezi C.* (2022) 79 Cal.App.5th 769 (review granted Sept. 21, 2022, S275578); *In re G.A.* (2022) 81 Cal.App.5th 355 (review granted Oct. 12, 2022, S276056); *In re M.M.* (2022) 81 Cal.App.5th 61 (review granted Oct. 12, 2022, S276099); *In re R.T.* (July 6, 2022, B315541) [nonpub. opn.] (review granted October 12, 2022, S275866); *In re Athena R.* (Dec. 13, 2022, B318751) [nonpub. opn.] (review granted Mar. 22, 2023, S278121); *In re X.R.* (Jan. 31, 2023, B318808) [nonpub. opn.] (review granted Apr. 12, 2023, S278928).

the matter to the juvenile court for compliance with ICWA and related California provisions.

DCFS concedes that the record fails to indicate whether it asked maternal great-aunt Bertha B., paternal grandfather Librado G., paternal aunts Rosio S. and Maria H., or paternal uncle Jorge, if Jorge is or may be an Indian child. In light of our high court's pending review of cases concerning the appropriate standard for evaluating reversible error in this context, DCFS agrees "that a concession is appropriate solely as to the challenges the parents raise concerning DCFS's and the juvenile court's compliance with the initial inquiry requirements of section 224.2, subdivision (b), so the matter can be remedied without further delay." It thus "agrees the juvenile court's order terminating parental rights should be conditionally affirmed or conditionally reversed and remanded for the sole purpose of ensuring compliance with the ICWA and related California statutes and for the juvenile court to make new ICWA findings."

Because DCFS agrees that a limited remand is appropriate, we conditionally affirm the juvenile court's order terminating parental rights and remand this matter to the juvenile court for the sole purpose of ensuring compliance with ICWA and related California statutes. We leave it to the juvenile court on remand to determine the precise scope of the required inquiry,[9] bearing in

---

[9] DCFS disputes the parents' apparent contention that Misty A. is an extended family member. It contends that Misty A. was related to Jorge by virtue of marriage to a cousin, and thus does not fall within the definition of "extended family member" for purposes of ICWA and related California law. Because we are remanding this matter to the juvenile court for compliance with

mind that ICWA should not be used "as 'a "get out of jail free" card' " to avoid termination of parental rights, and that "delays in finalizing adoptions or other permanent placements for children who cannot safely be returned to their parents do not serve the best interests of the children whom the dependency system is intended to protect."  (*Ezequiel G.*, *supra*, 81 Cal.App.5th at pp. 1001, 1003.)

---

ICWA and related California law, we will leave it to the juvenile court to address this dispute in the first instance.

## DISPOSITION

The order terminating parental rights is conditionally affirmed and the matter is remanded to the juvenile court for compliance with the inquiry provisions of ICWA and related California law and further proceedings not inconsistent with this opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

ADAMS, J.